# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **RONALD DWIGHT EADY,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:21-cv-00432** |
| | ) | **Chief Judge Crenshaw / Frensley** |
| **BIG G EXPRESS,** | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

## I.     INTRODUCTION

This matter is before the Court upon Defendant's Motion for Summary Judgment. Docket No. 41. Along with its Motion, Defendant has contemporaneously filed a supporting Memorandum of Law (Docket No. 42), a Statement of Undisputed Material Facts (Docket No. 43); an Appendix containing Plaintiff's "condensed" Deposition Transcript (Docket No. 44-1), Plaintiff's Employment Application (Docket No. 44-2), Company Policy One Pet (Docket No. 44-3), August Email Exchange (Docket No. 44-4), Plaintiff's Charge of Discrimination (Docket No. 44-5), the Declaration of John Fairchild (Docket No. 44-6), the August 1, 2022 Jon Lewis Email (Docket No. 44-7), the Harris August 1, 2022 3:52 pm Email (Docket No. 44-8), the Call Pilot Transcription of August 2, 2022, 9:31 am Voicemail (Docket No. 44-10), the Call Pilot Transcription of a different August 2, 2022 Voicemail (Docket No. 44-11); and a Notice of Manual Filing of Three Voicemails (Docket No. 45).

For the reasons set forth below, the undersigned finds that there are no genuine issues of material fact in dispute and that Defendant is entitled to a judgment as a matter of law on Plaintiff's claims under Title VII and the ADA. The undersigned therefore recommends that Defendant's Motion for Summary Judgment (Docket No. 41) be **GRANTED**. In light of the foregoing, the

undersigned recommends that this action be **DISMISSED WITH PREJUDICE**.

## II. SUMMARY OF ARGUMENT

As grounds for its Motion, Defendant argues that Plaintiff cannot prevail upon his race discrimination claim under Title VII of the Civil Rights Act of 1964, et seq. ("Title VII") because he cannot establish that a white driver replaced him or that a similarly situated commercial truck driver who had a major medical event, was hospitalized, and did not complete a fitness for duty examination, was not terminated. Docket No. 42. Defendant further argues that Plaintiff cannot show pretext because his only "evidence" of discrimination is that Defendant's CEO is "a big Trump supporter," and such claim does not show that the decision to fire Plaintiff was racially motivated. *Id.*

To the extent Plaintiff alleges disability discrimination or discriminatory termination under the Americans with Disabilities Act ("ADA"), Defendant argues that such claims fail because Plaintiff did not suffer from a covered disability and further fail because Plaintiff did not think he needed an accommodation, and because Plaintiff cannot establish that a dispatcher job was open. *Id.* Defendant additionally argues that such claims fail because Plaintiff cannot establish that he was replaced by a non-disabled driver. *Id.* Defendant argues that Plaintiff likewise cannot demonstrate pretext because he admits that the Department of Transportation required a physical before he returned to work, and it is undisputed that he did not complete the required physical. *Id.*

Plaintiff has filed a Response to Defendant's Motion. Docket No. 46. Plaintiff's "Response," however, does not actually respond to Defendant's arguments. *See id.* In his Response, Plaintiff instead maintains that: (1) he did not have a heart attack either during his employment with Defendant or in the years before and has never undergone any invasive surgery associated with cardiac issues, (2) his primary healthcare providers did not assess that he was

unable to perform his official duties as a truck driver due to "alleged cardiac health issues"; and (3) the undersigned has a duty to "investigate such serious claims, especially when they can jeopardize the Plaintiff's career and wellbeing" and that the failure to do so and the acceptance of Defendant's "false allegations and speculations without evidence" is improper and constitutes grounds for recusal *Id.*

Plaintiff also argues in his Response that the undersigned's denial of his "Motion to Subpoena for Production of Documentary Evidence (Phone Records, Text, and Emails)" "further proves his racial prejudice against Plaintiff." *Id.* Plaintiff's Response additionally argues that Defendant "misallocated funds and overcharged unsuspected [*sic*] clients post-pandemic" and he contends that he "wants to notify the Justice system about the illegal activities happening behind closed doors" and wants to "ensure that these crimes do not go unpunished." *Id.* Plaintiff also argues that "funds from their employee benefits program (the 401k) went missing "around the same time as former President Donald Trump's campaign" for Defendant. *Id.* Plaintiff contends that he "needs those records to prove Defendant's clear stance on white supremacy and political parties that refuse to provide equal rights and provisions to people of color" and as evidence that "his termination was based on racial bias instead of any company policy." *Id.*[1]

Despite filing a "Response" to Defendant's Motion itself, Plaintiff has not filed a Response to Defendant's Statement of Undisputed Material Facts, nor has he filed his own Statement of Undisputed Facts.

Defendant has filed a Reply, noting Plaintiff's failure to respond to its Statement of

---

[1] The bulk of Plaintiff's Response contains his allegations that the undersigned "engages in unethical practices to support friends and racially-biased verdicts" and Plaintiff repeatedly calls for the undersigned's recusal. *Id.*

Undisputed Material Facts as required. Docket No. 47. Defendant's Reply also notes that Plaintiff's Response failed to "respond in any fashion to the legal arguments raised in [its] Motion," such that Plaintiff's "inability to even address those legal arguments" merits summary judgment. *Id.*

Defendant notes that the arguments Plaintiff does make in his "Response" do not "aid his cause." *Id.* Defendant argues that: (1) there is no evidentiary basis for Plaintiff's "misplaced hostility to the Magistrate Judge"; (2) Defendant's Summary Judgment brief did not discuss a heart attack but, rather, stated, "Eady denies that he had a heart attack. Instead, Eady testified that he had a 'breathing problem' in that 'I couldn't breathe.' This event, whatever it was, occurred while Eady was at work'"; (3) the precise reason for Plaintiff's weeklong hospitalization is of little import under Title VII and the ADA, because what matters is that Plaintiff did not complete a fitness for duty after getting out of this hospital and his failure to do so constituted grounds for his termination; and (4) Plaintiff's unfounded accusations regarding the diverting of 401k funds to support former President Trump "does nothing" to support Plaintiff's allegation that his termination was race-based. *Id.*

Plaintiff filed his pro se Complaint in this action alleging that Defendant discriminated against him on account of his race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* Docket No. 1. Plaintiff further avers that Defendant violated his rights under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*; *Id.* Plaintiff filed his EEOC Charge of Discrimination on June 17, 2020, received his Right to Sue Letter on March 16, 2021, and filed the instant action on June 3, 2021. Docket Nos. 1, 6, 44-5.

The allegations of Plaintiff's Complaint, in their entirety, are as follows:

The Plaintiff, Ronald Eady (African American male), was employed with the Big G Express as an over-the-road truck driver from May 16, 2019, to August 21, 2019.

4

He noticed racial bias early on during his employment at Big G Express. The company had a pet policy that allowed drivers to ride with their dogs.

However, after completing his orientation, Chief Operating Officer Greg Thomas (white), informed Mr. Eady that his dog was not allowed inside the truck. He rejected the verification papers Mr. Eady had about his dog. Greg Thomas did not comply and brought forth a list. The document supposedly contained a list of pedigrees and breeds allowed inside the truck. Plaintiff was unaware of this rule but did not argue and arranged a kennel for his pet during his shift.

Later on, he met a female coworker/truck driver (white) who brought her pet to work. Mr. Eady noticed that her dog had the same pedigree and size as his pet. This demonstrates a clear bias against Plaintiff. He feels that as a minority, he was not granted the same rights as his Caucasian colleagues. It was apparent that Greg Thomas did not want Plaintiff to have his dog in the truck. The fact that Mr. Eady is a minority had a direct impact on his decision. He enforced his policies on the minorities more than the opposite ethnic group (i.e. Caucasian).

Things escalated after the incident on August 13, 2019. That day, he experienced shortness of breath while returning to Mt. Juliet, Tennessee, after delivering his load to a Starbucks branch in South Carolina. He immediately notified his supervisor and was told to seek medical attention between runs. As advised, he went to St. Thomas Medical Facility. The doctors ran several tests to diagnose his condition. Due to this, Mr. Eady was admitted to the hospital for eight days. He kept his supervisor (from Big G Express) in the loop during this time.

Upon his release from the hospital (on August 21, 2019), the company requested a DOT Physical to assure that he was fit to return to work. Plaintiff complied and visited the referred clinic, Physicians Mutual on Church Street, Murfreesboro, TN. The healthcare providers refused to offer him medical services. Upon inquiry, the medical staff told him that his heart condition was an issue. They declined the medical records he had received from his cardiologists.

Big G Express discharged him the same day even though he asked for a reasonable accommodation as per his rights. Plaintiff shared his desire to switch to office work and become a dispatcher. They rejected this idea under the pretense that he was inexperienced. It, however, was not true, as he had over ten years of experience in dispatching. Mr. Eady filed a charge against the defendants with the EEOC in Nashville, TN. His complaint was declined based on inadequate evidence.

Plaintiff claims that Big G Express wrongfully terminated him. As a minority, Plaintiff feels victimized and singled out by this behavior. The defendant(s) violated the Americans with Disability Act Amendments Act [*sic*] of 2008 and Title VII of the Civil Rights Act [of] 1964, as amended. He lost his job and monthly earnings because of racial bias and faced financial and mental distress for an extended period.

5

Plaintiff requests the civil court to consider these circumstances when they review my complaint.

Docket No. 1.

Plaintiff avers that, "After being wrongfully terminated, [he] suffered diabetes and emotional distress." *Id.* He notes that he was "out of work for more than three years and caught COVID-19." *Id.* Plaintiff seeks "loss [*sic*] wages, back pay and front pay damages for emotional distress" as well as "punitive and compensatory pay damages" totaling $750,000.00. *Id.*

### III. UNDISPUTED FACTS[2]

Big G Express is a corporation that is engaged in "over-the-road" trucking. Declaration of John Fairchild ("Fairchild Dec."), Docket No. 44-6, ¶ 3. Plaintiff is a commercial truck driver who has a Commercial Driver's License ("CDL"). Deposition of Ronald Dwight Eady ("Plaintiff's Dep."), Docket No. 44-1 at 9, 12. Plaintiff has been driving tractor-trailer trucks for about twenty years. *Id.* at 9-10. Plaintiff has had a myriad of trucking jobs, both before and after working for Defendant, most of which were for short stints. *Id.* at 41-47, 49-53; *see also* Plaintiff's Application for Employment, Docket No. 44-2.

As Plaintiff understands it, the Department of Transportation ("DOT") has regulations on who can and who cannot drive tractor-trailers. Plaintiff's Dep. at 12.

Plaintiff has applied twice to work at Defendant; both times, it was Defendant that approached him. Plaintiff's Dep. at 13. On the first occasion, Plaintiff ran into Defendant's employee at a restaurant and that employee encouraged him to apply for a position with the company. *Id.* Plaintiff worked as a truck driver for Defendant from July 7, 2004, to August 5, 2004. Fairchild Dec., ¶ 4.

---

[2] The following facts are in a form required by Fed. R. Civ. P. 56, and are undisputed.

6

On the second occasion, Plaintiff was sitting at a restaurant across from a gas station in Shelby County, Tennessee when he observed a Big G Express truck run into a gas pump. Plaintiff's Dep. at 13-15. Plaintiff called the company and told them about the negligent driving of one of their employees. *Id.* The person Plaintiff spoke to when he made the call was a recruiter for Defendant. *Id.* The recruiter asked Plaintiff to come apply for a job. *Id.* When Plaintiff was speaking to the recruiter, he told her, "I've got a dog that I love dearly." *Id.* The recruiter replied, "Bring him. We've got a pet policy. We encourage people to bring a dog. We've got a lot of drivers with dogs." *Id.* Plaintiff's dog was named Tyson. *Id.* at 22.

Plaintiff applied for and got a commercial driver job with Defendant. *Id.* at 15. Plaintiff was rehired in the summer of 2019 and worked out of Defendant's Mount Juliet, Tennessee office. Fairchild Dec., ¶ 5.[3] Plaintiff's direct supervisor was John Wade. *Id.* at ¶ 6. As part of his onboarding, Plaintiff went to a new employee orientation. Plaintiff's Dep. at 15. At orientation, Plaintiff recalls Greg Thompson telling him that he could not bring his dog to work. *Id.*[4] Plaintiff testified that Thompson did not have a problem with dogs in general but had concerns about the pedigree of Plaintiff's dog. *Id.* at 16. Plaintiff's dog was a "pit bull terrier mix." *Id.*

Plaintiff took paperwork with him to work related to his dog. Plaintiff's Dep. at 17. Plaintiff stated that Mr. Thompson looked at that paperwork and, when he saw that it read "terrier pit bull mix," said "No, I'm not letting that dog in the truck." *Id.* Plaintiff believes Mr. Thompson "profiled" his dog, based upon his breed. *Id.* at 23.

---

[3] Plaintiff's recollection is that he began working for Defendant on or around June 8, 2019. Plaintiff's Dep., at 24. Company records show that Plaintiff was rehired on August 13, 2019. Fairchild Dec., ¶ 5.

[4] Plaintiff characterizes Greg Thompson as the "Secretary of State" at Defendant and is the "person to put on the lawsuit" if you sue the company. Plaintiff's Dep. at 16. Based on the interactions described, Defendant believes that it was "likely that this interaction was with Gregg Brown, not Greg Thompson." Fairchild Dec., ¶ 17.

7

Defendant has a formal written policy on drivers riding with pets. Fairchild Dec., ¶ 16; *see also* Company Policy – One Pet ("Pet Policy"), Docket No. 44-3. That policy provides that drivers can take one dog or one cat with them in their trucks, and the policy expressly states that the pet's "breed must be non-aggressive." *See* Pet Policy. Plaintiff recalls that Mr. Thompson had a list of prohibited dogs, and pit bulls were included on the prohibited list. Plaintiff's Dep. at 17.

Plaintiff explained his desire to have his dog, Tyson, ride with him as follows:

**Q**. As far as why you wanted your dog to ride with you, did you have any sort of medical condition?

**A.** He was a good companion. And I wanted him to be a service dog. Because if I ever had some issue, that dog knew when I was sick. He knew when I wasn't feeling well.

**Q**. What kind of issues did your dog sense?

**A.** If I had a headache, he knew I wasn't feeling well.

**Q**. Any other condition?

**A.** Well, if I had breathing problems, okay, which I had some breathing problems, he knew that. He would cozy up to the side of me and stand there and watch me, guard me. He would guard me.

Plaintiff's Dep. at 23-24.

Plaintiff testified that when he was talking with Mr. Thompson about why he wanted his dog Tyson to ride with him in his truck, Plaintiff did not explain to him that his dog sensed his headaches and breathing problems, and that was why he wanted Tyson to ride with him. Plaintiff's Dep. at 24. Plaintiff claims what white drivers were allowed to have dogs in their 18-wheelers, but he was not. *Id.* at 56.

In August 2019, Plaintiff suffered a significant medical event. Plaintiff's Dep. at 25. Plaintiff denies that he had a heart attack. *Id.* Instead, Plaintiff testified that he had a "breathing problem" and stated, "I couldn't breathe." *Id.* This event occurred while Plaintiff was at work. *Id.*

8

at 27-29. Plaintiff had just brought a load back from South Carolina and was sitting at the company's dispatch terminal. *Id.* at 28. Plaintiff's breathing became labored, and he was told by individuals that he did not look well. *Id.* Plaintiff told "dispatch" that he did not feel well, and he was sent to the hospital. *Id.* at 28-29.

Plaintiff was admitted to St. Thomas Rutherford Hospital on August 22, 2019 and remained there until August 29, 2019. *Id.* at 25; *see also* Fairchild Dec., ¶ 7. Plaintiff testified that, "they treated me like a guinea pig" and "checked me out thoroughly." Plaintiff's Dep. at 29. Amongst other tests, a catheterization was performed. *Id.* Plaintiff was examined by a cardiologist, who said that he "had looked through your heart and you've got a heart like a racehorse." *Id.* at 25. The physician released Plaintiff from the hospital and gave him a "back-to-work slip." *Id.*

While Plaintiff was in the hospital, Plaintiff had been in communication with Defendant's human resources department about his hospitalization. *Id.* at 27.

On August 30, 2019, Defendant informed Plaintiff that he needed to go to Physicians Medical Care in Murfreesboro, Tennessee to complete a "return-to-duty" physical. *Id.* at 30; *see also*, Fairchild Dec., ¶ 9.

As a commercial motor vehicle driver, the DOT issues regulations on driver safety and ensuring that drivers are fit to drive an 18-wheeler. Fairchild Dec., ¶ 10. As a commercial vehicle driver, it is Defendant's practice to require a driver to complete a physical prior to returning to duty after a hospitalization or major medical event. *Id.* It is Defendant's understanding that the DOT's Federal Motor Carrier Safety regulations require commercial truck drivers to pass a physical exam to ensure that they do not have any physical, mental, or organic condition that might affect safety. *Id.*

Plaintiff admitted that the DOT requires physicals in order for drivers to return to work,

and he described his physical as a "DOT physical." Plaintiff's Dep. at 30. An African American nurse with the last name of Moon administered Plaintiff's physical at Physician's Medical Care. *Id.* at 30-32. Plaintiff had previously undergone a DOT physical by Nurse Moon at this location and, during that physical, she had cleared him to drive. *Id.* But this time, Plaintiff found her to have "a real bad attitude." *Id.* Plaintiff stated that Nurse Moon "didn't like me" and "she didn't want me there." *Id.* Plaintiff testified that Nurse Moon told him, "You've just been in the hospital," to which Plaintiff replied, "I've got a strong heart," after which Nurse Moon said, "We're refusing treatment." *Id.*

Plaintiff later learned that Nurse Moon informed an investigator with the EEOC that he was "belligerent" during this visit and that he was "acting disorderly." *Id.* at 32-33. Nurse Moon further informed the EEOC that Plaintiff was "jumping up and down" and "acting crazy." *Id.* at 33. Plaintiff testified that Nurse Moon, who is African American like Plaintiff, lied to the EEOC and lied to Defendant when conveying that Plaintiff had been belligerent during this visit. *Id.*

Plaintiff testified that, after the "DOT physical" visit, he and Defendant "went into this phase that I call the Americans with Disability." *Id.* at 34. Plaintiff asked Defendant for "reasonable accommodations" by working as a dispatcher. *Id.* Defendant responded by pointing out that Plaintiff had no experience working as a dispatcher. *Id.* Plaintiff testified that he had no evidence that Defendant had any open dispatcher positions at that time. *Id.* at 37. When Defendant asked if he needed any reasonable accommodations at that time, Plaintiff responded, "I don't think so, but apparently Physicians Mutual thought so." *Id.*

Dawn Rogers, a Human Resources Assistant for Defendant, emailed Mr. Wade, informing him that Plaintiff would not be returning from medical leave. Fairchild Dec., ¶ 12. When Chris Kelly, Defendant's Operations Manager, asked whether this was a voluntary termination, Ms.

Rogers responded "Yes" and stated that Plaintiff "was unable to pass the DOT physical." *Id.,* ¶ 13; *see also* August 2019 email exchange, Docket No. 44-7. Plaintiff's last day worked was August 21, 2019, and his employment was terminated on September 4, 2019. *Id.,* ¶ 14. Plaintiff's employment was terminated because he did not complete a DOT-required physical, after being hospitalized for a week. *Id.*

With regard to his racial discrimination claim, Plaintiff testified that the basis of his claim was as follows:

**Q.** So you think you were fired because of your race; is that correct?

**A.** Yeah. I think so.

**Q.** Why do you think that?

**A.** Well, I didn't like the fact that Greg Thompson and Donald Trump cozied up. I mean, doing an informercial with Donald Trump, I mean, that's not saying too much for our people.

Plaintiff's Dep. at 38.

Plaintiff did not approve of the fact that Mr. Thompson allegedly donated money to the Trump campaign and asked other drivers to "participate in a commercial he was doing with Donald Trump." *Id.*

When asked if there were any other reasons why he contended that he was fired because of his race, Plaintiff testified that there were no African Americans in Defendant's management team. *Id.* at 39. Plaintiff is mistaken as Mr. Ron Moulden, an African American male, is the Executive Vice President responsible for Defendant's sister company, IKE Transportation. Fairchild Dec., ¶ 18.

Plaintiff also identified Mr. Thompson's alleged dislike of an employee named Jack Marsh, who Plaintiff believed to be African American. Plaintiff's Dep. at 39-40. Mr. Thompson, however,

11

has no dislike of Mr. Marsh, who is actually Caucasian. Fairchild Dec., ¶ 19. Mr. Marsh serves as Defendant's Chairman of the Board. *Id.*

When asked at his deposition whether anyone referenced his race or ethnic background when communicating any employment decision to him, Plaintiff could not identify any such comment. Plaintiff's Dep. at 36. Plaintiff admits that no one ever directed any racial slurs toward him. *Id.*

Defendant had other drivers besides Plaintiff who were African American. Plaintiff's Dep. at 18. When Plaintiff was asked whether those drivers had thoughts about Mr. Thompson or what it was like to work at the company, Plaintiff replied that the African American's working for Defendant did not like the fact that Mr. Thompson was "cozying up with Donald Trump." *Id.* It was Plaintiff's impression that Mr. Thompson was a "Trump supporter" and "Trump can't do no wrong in his eyes." Plaintiff's Dep. at 19. Plaintiff admits that Mr. Thompson never said anything overtly racial to him, nor did he ever use any derogatory names or slurs. *Id.*

Regarding Plaintiff's claims under the ADA, Plaintiff admits that no one at Defendant ever said he was being fired because he had a disability. *Id.* at 40. When asked why he thinks a disability had something to do with his termination, Plaintiff testified, "Like I said, when I presented myself back to them, I was okay. I was ready to roll. Okay? I went to work for another company, and I'm fine driving every day, working every day, enjoying life, providing for my family." *Id.*

Plaintiff filed a Charge of Discrimination with the EEOC on June 17, 2020 – 299 days after the date he recalls being terminated, and more than 300 days after he recalls beginning his employment with Defendant on June 8, 2019 (and thus 308 days after company records reflect that Plaintiff was hired and his request to bring his dog Tyson in his truck was denied). *Id.* at 56; Fairchild Dec., ¶ 5; *see also* Plaintiff's EEOC Charge, Docket No. 44-5. Plaintiff's EEOC Charge

makes no mention of his dog Tyson and does not assert any accommodation claim related to his dog. Plaintiff's Dep. at 56; *see also* Plaintiff's EEOC Charge.

On August 1, 2022, an attorney named Jon Lewis reached out to defense counsel. *See* August 1, 2022 Jon Lewis email, Docket No. 44-7. He stated that he represents Plaintiff in a workers' compensation matter against another entity, and Plaintiff asked him to see if he could facilitate a resolution dialogue in this matter. *Id.* Counsel had a conversation, in which it was conveyed that Plaintiff was free to make a settlement offer, but it should take into account Defendant was about to file a motion for summary judgment. *Id.* During the next twenty-four hours, after receiving the news that summary judgment was forthcoming, Plaintiff promptly left defense counsel three voicemails. Docket Nos. 44-10; 44-11; 45.

First, on August 1, 2022, Plaintiff left a voicemail that says, "Hey Jonathan, I'm ready for that summary judgment. Bring it on. I think you're gonna get disbarred, that's what I think. I think you're gonna get disbarred for some of the stuff you done done [*sic*]." *Id.*

On August 2, 2022, at 9:31 a.m., Plaintiff left defense counsel a second voicemail that stated, "Hey Harris. Hey look here. Greg Thompson and I had an argument to start in his office. You never asked me about it, but that's going to be tangible evidence, that argument we had concerning me taking my dog on the ride along and him not wanting me to work for him. So, that's going to be interesting. And as far as you getting a summary judgment, I'm bring [*sic*] you up on charges, okay? I'll file charges against you. You'll get that Sixth Circuit stuff, that's a whole lot of paperwork. Alright, *I don't like you. You're a redneck. I don't like you.*" *Id.* (italics original).

Twenty-one minutes later, on August 2, 2022, at 9:52 a.m., Plaintiff left defense counsel a third voicemail stating, "Yeah, Harris. Hey, Greg Thompson and I had an argument to start my employment, okay, where some names was called and some stuff was said. That's not in your

deposition because you never asked me that. So, it's tangible evidence. And as far as you getting a summary judgment, I'm bringing you up on charges, I hope they disbar you, ok? Anyway, nevertheless, we can go at it because *you are definitely a redneck, a racist redneck*. So we can go at it." *Id.*  Plaintiff's last voicemail is contrary to his sworn testimony, where (after being asked if anyone said anything racial to him), he admitted that neither Mr. Thompson nor anyone else ever said anything overtly racial to him or used any derogatory named or slurs. Plaintiff's Dep. at 19, 36.

## IV. APPLICABLE LAW AND ANALYSIS

### A.    Local Rules 56.01(c) and (f)

With regard to responses to the requisite Statement of Undisputed Facts filed contemporaneously in support of a Motion for Summary Judgment, Local Rules 56.01(c) and (f) state:

> **(c) Response to Statement of Facts**. Any party opposing the motion for summary judgment must respond to each fact set forth by the movant by either:
>
> > (1) Agreeing that the fact is undisputed;
> > (2) Agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or
> > (3) Demonstrating that the fact is disputed. Each disputed fact must be supported by specific citation to the record.
>
> The response must be made on the document provided by the movant or on another document in which the non- movant has reproduced the facts and citations verbatim as set forth by the movant. In either case, the non-movant must make a response to each fact set forth by the movant immediately below each fact set forth by the movant. Such response must be filed with the papers in opposition to the motion for summary judgment. In addition, the non-movant's response may contain a concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried. Each such disputed fact must be set forth in a separate, numbered paragraph with specific citations to the record supporting the contention that such fact is in dispute. A copy of the statement of additional disputed facts must also be provided to opposing counsel in an editable electronic format. Pro se parties are excused only from providing a copy of the statement of additional disputed material facts to

opposing counsel in an editable electronic format, and such pro se parties must otherwise comply with the requirements of this section.

. . .

**(f) Failure to Respond.** If a timely response to a moving party's statement of material facts, or a non-moving party's statement of additional facts, is not filed within the time periods provided by these rules, the asserted facts shall be deemed undisputed for purposes of summary judgment.

As has been noted, Plaintiff has failed to respond to Defendant's Statement of Undisputed Material Facts. Accordingly, the facts contained therein are deemed undisputed for purposes of summary judgment. Nevertheless, it would be inappropriate to grant Defendant's Motion solely on the ground that Plaintiff has failed to respond to its Statement of Undisputed Material Facts. *See Stough v. Mayville Community Schools*, 138 F.3d 612, 614 (6th Cir. 1998). As the Sixth Circuit has stated:

> The Court is required, at a minimum, to examine the movant's Motion for Summary Judgment to ensure that he has discharged [his initial] burden ... The federal rules require that the party filing a Motion for Summary Judgment "always bears the burden of demonstrating the absence of a genuine issue as to a material fact."

*Id.* (citations omitted). The Court will, therefore, consider whether Defendant has met its burden under the appropriate summary judgment standards discussed below.

## B.    Motion for Summary Judgment

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

In order to prevail on a Motion for summary judgment, the moving party must meet the

15

burden of proving the absence of a genuine issue as to material fact concerning an essential element of the opposing party's claim. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). In determining whether the moving party has met its burden, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

Fed. R. Civ. P. 56(c)(1) sets forth the requirement to support factual assertions as follows:

**(c) Procedures.**

**(1)** *Supporting Factual Positions*. A party asserting that a fact cannot be or is genuinely disputed must support that assertion by:

> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

**C.     Title VII of the Civil Rights Act of 1964**

**1.     Generally**

Title VII of the Civil Rights Act of 1964 ("Title VII") protects employees from discrimination on the basis of an individual's race, color, religion, sex, or national origin, and provides, in part:

> It shall be an unlawful employment practice for an employer--

> 1.     to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

2.    to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2.

Federal courts do not have jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC Charge or the claim can reasonably be expected to grow out of the EEOC Charge. *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir. 1998), *citing Ang v. Procter & Gamble Co.,* 932 F.2d 540, 544-45 (6th Cir. 1991). Thus, as a prerequisite to bringing a Title VII discrimination claim in federal court, a claimant is required to file a Charge of discrimination or retaliation with the EEOC and is precluded from seeking judicial review until the Commission has made a final disposition of his claim. 42 U.S.C. § 2000e-5. *See also, United Air Lines, Inc. v. Evans*, 431 U.S. 553, 554, 97 S. Ct. 1885, 1887, 52 L. Ed. 2d 571 (1977). The wording of the allegations in the EEOC Charge does not, however, have to be exact or all-encompassing; rather, the court may consider allegations not explicitly stated in the EEOC Charge if those allegations could reasonably be expected to grow out of the Charge of discrimination. *Tipler v E. I. du Pont de Nemours & Co.*, 433 F.2d 125, 131 (6th Cir. 1971).

**2.    Prima Facie Case of Discrimination**

In order to establish a prima facie case of discrimination in violation of Title VII, a plaintiff must prove that,

1.    he is a member of a protected class;

2.    he was qualified for his job and performed it satisfactorily;

3.    despite his qualifications and performance, he suffered an adverse employment action; and

4.    that he was replaced by a person outside the protected class

17

or was treated less favorably than a similarly situated
individual outside his protected class.

*Johnson v. University of Cincinnati*, 215 F.3d 561, 572-73 (6th Cir. 2000), *citing McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (footnote added).

### 3.    Evaluation Standards

A plaintiff may establish a claim of discrimination under Title VII either by introducing

direct evidence of discrimination, or by proving circumstantial evidence that would support an

inference of discrimination. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000),

*citing Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir.1997). "The direct evidence

and the circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or

the other, not both." *Id.*

Under the direct evidence approach, once the plaintiff introduces evidence that the

employer terminated her because of her protected status, the burden of persuasion shifts to the

employer to prove that it would have terminated the plaintiff even had it not been

motivated by discrimination. *Johnson*, 215 F.3d at 572, *citing Manzer v. Diamond Shamrock*

*Chemicals Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994), *citing Price Waterhouse v. Hopkins*, 490 U.S.

228, 244-45, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989).

If the plaintiff lacks direct evidence of discrimination, the circumstantial evidence

approach is used and the *McDonnell Douglas-Burdine* tripartite test is employed. *See McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), as later clarified

by *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207

(1981). The *McDonnell Douglas-Burdine* tripartite test requires the plaintiff to first establish a

prima facie case of discrimination. *Id.* If the plaintiff is able to do so, a mandatory presumption

of discrimination is created and the burden of production shifts to the defendant to articulate some

18

legitimate, nondiscriminatory reason for the employee's rejection. *Id.* If the defendant carries this burden, the plaintiff must then show that the proffered reason was actually pretextual. *Id.* The plaintiff may establish pretext by showing that: (1) the stated reasons had no basis in fact; (2) the stated reasons were not the actual reasons; or (3) the stated reasons were insufficient to explain the defendant's action. *Id. See also, Cicero v. Borg-Warner Automotive, Inc.,* 280 F.3d 579, 589 (6th Cir. 2002). "A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).

### D. The Americans with Disabilities Act ("ADA")

#### 1. Generally

The Americans with Disability Act ("ADA") protects employees from discrimination based on their disabilities, and provides, in part:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112.

#### 2. Prima Facie Case of Discrimination

In order to sustain an ADA claim, an employee must first make out a prima facie case of discrimination by establishing that:

1.      he is an individual with a disability covered by the ADA;

2.      he is otherwise qualified for the position, with or without reasonable accommodation;

3.      he suffered an adverse employment decision;

4.      the employer knew or had reason to know of the plaintiff's disability; and

5.      the position remained open while the employer sought other applicants or the disabled individual was replaced.

*Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996).  *See also* 42 U.S.C. §§ 12111 and 12112.

### 3.      Failure to Accommodate

In order to sustain a failure to accommodate claim under the ADA, an employee must first make out a prima facie case establishing that:

1.      he is an individual with a disability covered by the ADA;

2.      he is otherwise qualified to perform the essential functions of the job with or without a reasonable accommodation;

3.      the employer was aware of the plaintiff's disability; and

4.      the employer failed to provide a reasonable accommodation for his disability.

*Ford v. Frame.*, 3 Fed. App'x. 316, 318 (6th Cir. 2001).

### 4.      Evaluation Standards

Claims brought under the ADA are evaluated under the same *McDonnell Douglas-Burdine* tripartite test utilized in Title VII cases. The *McDonnell Douglas-Burdine* tripartite test requires the plaintiff to first establish a prima facie case of discrimination.  If the plaintiff is able to do so, a mandatory presumption of discrimination is created and the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection.  If the defendant carries this burden, the plaintiff must then prove that the proffered reason was actually pretextual.

20

*See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), as later clarified by *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).  The plaintiff may establish pretext by showing that, 1) the stated reasons had no basis in fact; 2) the stated reasons were not the actual reasons; and 3) that the stated reasons were insufficient to explain the defendant's action.  *Id.*  "A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason."  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).

### E.     The Case at Bar

### 1.     Claims Related to Plaintiff's Dog Tyson

As a preliminary matter, as noted above, Federal courts do not have jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC Charge or the claim can reasonably be expected to grow out of the EEOC Charge.  *Abeita*, 159 F.3d at 254 (6th Cir. 1998), *citing Ang,* 932 F.2d at 544-45 (6th Cir. 1991). Additionally, the Charge must be timely-filed. In order for an EEOC Charge to be timely-filed, the charging party must file the Charge within 300 days of the adverse employment decision of which he complains. *Hoover v. Timken Co.,* 30 F. App'x 511, 513 (6th Cir. 2002), *citing* 42 U.S.C. 12117(a) and 2000e-5(e)(1); *see also Parry v. Mohawk Motors of Mich., Inc.,* 236 F.3d 299, 309 (6th Cir. 2000).

In the case at bar, it is undisputed that records reflect that Plaintiff started on August 13, 2019,[5] and that Plaintiff underwent an orientation at that time. Fairchild Dec., ¶ 5; Plaintiff's Dep.

---

[5] Plaintiff, in his EEOC Charge, avers that he was employed by Defendant as a truck driver around May 16, 2019. Docket No. 44-5. Using Plaintiff's employment date, his EEOC Charge was filed nearly 400 days after Mr. Thompson told him that his dog, Tyson, could not ride with him in his truck.

at 15, 24. It is further undisputed that Mr. Thompson told Plaintiff at his orientation that his dog, Tyson, could not ride with him in his truck, and that this refusal is an action about which Plaintiff complains. Plaintiff's Dep. at 15-17. Plaintiff filed his EEOC Charge of Discrimination on June 17, 2020, 308 days after Mr. Thompson told Plaintiff that he could not bring his dog, Tyson, with him in his truck. *See* Docket No. 44-5, Fairchild Dec., ¶ 5, Plaintiff's Dep. at 15-17, 24. Accordingly, Plaintiff's claims about the refusal to allow his dog, Tyson, to ride with him are time-barred and should be dismissed.

Inasmuch as Plaintiff intends the refusal to allow his dog, Tyson, to ride with him in the truck to constitute an accommodation claim, Plaintiff's EEOC Charge does not contain any allegations which could give rise to such a claim. *See* Docket No. 44-5. And while the wording of the allegations in the EEOC Charge does not have to be exact or all-encompassing, in order for the Court to consider allegations not explicitly stated in the Charge, the allegations must reasonably be expected to grow out of the Charge of discrimination. *Tipler*, 433 F.2d at 131.

Plaintiff's EEOC Charge indicates that he alleges discrimination based upon race, color, and disability. *Id.* Plaintiff's Charge further indicates that both the earliest and the latest date the alleged discrimination took place was August 21, 2019. *Id.* Specifically, the allegations of Plaintiff's EEOC Charge, in their entirety, are as follows:

> I was employed with the above named [*sic*] employer as a Truck Driver around May 16, 2019. I am an African American male with a qualifying disability under the ADAAA.
>
> Around August 13, 2019, I had a medical incident while performing my job duties. I sought medical treatment the same day. Around August 21, 2019, when I attempted to return to work I was told that I needed a DOT physical. When I went to the referred clinic I was told that I was unable to be examined and I was discharged from the company the same day.
>
> I believe I have been discriminated against due to disability, and my race and/or color, in violation of the Americans with Disabilities Act Amendments Act of 2008

and Title VII of the Civil Rights Act of 1964, as amended.
*Id*.[6]

Because Plaintiff's EEOC Charge says nothing about seeking a service animal accommodation or not being allowed to have a dog in his truck when white drivers were allowed to do so, and there is nothing in his Charge to alert the EEOC that either were claims that Plaintiff wished to raise, these claims are not properly before the Court and should be dismissed.

Even if Plaintiff's claims regarding his dog, Tyson, were not time-barred or outside the scope of his EEOC Charge, Plaintiff cannot establish a claim of discrimination because he cannot establish the requisite elements. Specifically, although Plaintiff alleges that white truck drivers were allowed to have a pet in the truck, the undisputed facts establish that Defendant had a one pet policy that expressly prohibited aggressive breeds and Plaintiff has failed to adduce any evidence that any drivers were allowed to have pit bulls or other aggressive breeds in their trucks. Similarly, Plaintiff has adduced no evidence of pretext. Because Plaintiff has failed to adduce evidence that he was treated less favorably than a similarly situated individual outside his protected class and because he has failed to adduce any evidence of pretext, Plaintiff's racial discrimination claim would nevertheless need to be dismissed.

Turning to Plaintiff's ADA claims, even if Plaintiff's service animal accommodation claims would have been properly part of a timely-filed EEOC Charge, the undisputed facts establish that when Plaintiff was talking with Mr. Thompson about why he wanted his dog Tyson to ride with him in his truck, Plaintiff did not explain to him that his dog sensed his headaches and breathing problems, and that was why he wanted Tyson to ride with him. Plaintiff's Dep. at 24.

---

[6] While the undisputed facts establish different dates than indicated by Plaintiff in his EEOC Charge, the allegations are included herein to demonstrate that Plaintiff did not assert allegations that could indicate complaints regarding to the refusal to let his dog, Tyson, ride with him.

Because Plaintiff cannot establish that (1) Defendant knew or had reason to know about his disability; (2) he requested his dog as an accommodation; (3) allowing an aggressive dog breed to ride in the truck against explicit company policy would be a "reasonable" accommodation; and (4) Defendant failed to provide the necessary accommodation, he would be unable to prevail on those claims and they would need to be dismissed.

### 2. Plaintiff's Termination Claims

Inasmuch as Plaintiff asserts that Defendant's failure to place him as a dispatcher constitutes a violation of the ADA, Plaintiff has failed to establish that he suffers from a covered disability. While it is undisputed that Plaintiff asked Defendant for "reasonable accommodations" by working as a dispatcher and Defendant responded by pointing out that Plaintiff had no experience working as a dispatcher (Plaintiff's Dep. at 34), Plaintiff has not averred, nor has he adduced any evidence to support, that he suffers from a physical or mental impairment that impairs or limits any major life activities. In fact, it is undisputed that when Defendant asked Plaintiff if he needed any reasonable accommodations at that time, Plaintiff responded, "I don't think so, but apparently Physicians Mutual thought so," and that Plaintiff testified, "[w]hen I presented myself back to them, I was okay. I was ready to roll. Okay? I went to work for another company, and I'm fine driving every day, working every day, enjoying life, providing for my family." *Id.* Absent evidence that Plaintiff suffered a disability as defined by the ADA, he cannot prevail on his ADA claims and they should be dismissed.

Turning to Plaintiff's claim that he was fired because of a disability, beyond failing to establish that Plaintiff was a qualified individual with a disability, the undisputed facts establish that Plaintiff's employment was terminated because he did not complete a DOT-required physical, after being hospitalized for a week. Fairchild Dec., ¶ 14. Plaintiff has adduced no evidence that

any other drivers were allowed to work as a commercial driver without completing and passing a DOT-required physical after a hospitalization. Accordingly, Plaintiff has failed to establish that a similarly situated employee was treated more favorably than he was, as required to establish a prima facie case. Moreover, Plaintiff has adduced no evidence either that he was replaced by a white driver or that terminating his employment for failure to complete and pass a DOT-required physical after a hospitalization was pretext. In fact, it is undisputed both that Plaintiff admitted that the DOT requires physicals in order for drivers to return to work and that Plaintiff failed to complete and pass such physical. Plaintiff's Dep. at 30-33; Fairchild Dec., ¶ 13. Additionally, it is undisputed that Defendant never said Plaintiff was being fired because he had a disability. Plaintiff's Dep. at 40.

As discussed herein, both Plaintiff's claims for race and disability discrimination fail in relation to his termination. It is undisputed that the Plaintiff failed his DOT required physical after a hospitalization. Without passing the required physical the Defendant could not return Plaintiff to his previous position as a truck driver. Because Plaintiff lacked the experience to perform the function of a dispatcher, that position was unavailable to him. Plaintiff pointed to no evidence that there was any other motivation for his termination. Further, he identifies no similarly situated individuals outside his protected category who were afforded such an accommodation or that a such a position was even available. Considering the above, Plaintiff cannot sustain this claim and it should be dismissed.

## V.    CONCLUSION

For the foregoing reasons, the undersigned finds that there are no genuine issues of material fact, and that Defendant is entitled to a judgment as a matter of law on Plaintiff's claims under Title VII and the ADA. The undersigned therefore recommends that Defendant's Motion for

Summary Judgment (Docket No. 41) be **GRANTED**. In light of the foregoing, the undersigned recommends that this action be **DISMISSED WITH PREJUDICE**.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**JEFFERY S. FRENSLEY**
**United States Magistrate Judge**